UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA               :

      v.                                    :          23 Cr. 50 (VM)

TIMOUR ABRAMOV,                         :

    Defendant.                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum to aid the Court in connection with the upcoming sentencing of defendant Timour Abramov ("Abramov"), scheduled for May 5, 2023, at 1:00 p.m.[1] On January 30, 2023, Abramov waived indictment and pleaded guilty in front of Magistrate Judge Willis to a one-count Information charging him with participating in a wire fraud conspiracy in violation of 18 U.S.C. § 1349. Docket No. 6. The Court subsequently accepted Abramov's plea on February 2, 2023. Docket No. 9.

Abramov engaged in a conspiracy to defraud the Metropolitan Transportation Authority ("MTA") and enrich his bottom line. His criminal conduct subverted the integrity of, and trust in, MTA public auctions. As a result, the MTA was harmed and honest bidders lost auctions they might have otherwise won. Exhibit 1 summarizes the affected auctions.

For the reasons stated herein, the government respectfully recommends that the Court impose a sentence within the applicable Guidelines range of 8 to 14 months and a fine in the

---

[1] On February 13, 2023, co-conspirators Marina Yaniuk and Dzmitry Yaniuk pleaded guilty before Magistrate Judge Aaron to the same charge for their roles in the wire fraud conspiracy. Their pleas were accepted by Your Honor on February 27, 2023, and their sentencings will follow Abramov's sentencing, on May 5, 2023, at 2:00 p.m. and 3:00 p.m., respectively.

range of $4,000 to $40,000. The sole victim in this case, the MTA, suffered a loss, but because of the difficulty of calculating that loss, the government is not seeking restitution. *See* 18 U.S.C. § 3664A(c)(3)(B).

I.   **THE OFFENSE CONDUCT**

The Presentence Report dated April 21, 2023 ("PSR"), accurately outlines Abramov's offense conduct. *See* PSR ¶¶ 9-17. As noted in the PSR, the evidence has established that Abramov, Marina Yaniuk, and Dzmitry Yaniuk devised a scheme in which they used Marina Yaniuk's position in the Asset Recovery Unit ("ARU") of the MTA to rig five online auctions between November 2019 and February 2021.

The purpose of the ARU is to dispose of products and materials that the MTA previously purchased but no longer needs. The ARU attempts to sell those assets, typically through a public auction process that is conducted on a regular and frequent basis. The MTA notifies potential bidders of the assets for sale in upcoming auctions through public advertisements online, and interested bidders submit their bids, using a standard form that is submitted by email to a shared email-inbox that ARU employees can access. The advertisements contain the specific date and time each bid must be submitted. In general, the winning bidder of an auction is the bidder who submits the highest bid for the surplus asset(s). The bids are considered "blind bids," meaning that a bidder cannot see the bids submitted by competing bidders during the bidding process, and cannot change a bid once it has been submitted to the ARU. Thus, the sharing of bid prices is prohibited during the bidding, and the bid prices are not released to the public until after the auction has ended. In this case, the products for bidding consisted of Toyota Camrys and Paratransit buses.

Abramov and Dzmitry Yaniuk worked as car inspectors for the MTA. Marina Yaniuk, Dzmitry's wife, was also employed by the MTA, as an ARU sales specialist, where she assisted in administering the online auctions and had access to the shared email-inbox referenced above.

Pursuant to the scheme, Abramov and Dzmitry Yaniuk covertly bid on ARU auctions as "Company A." Abramov had a pre-existing business relationship with one of Company A's owners, "Individual A." Company A was in the business of buying and selling used cars, some of which were bought and sold at public auctions. In exchange for allowing Abramov and Dzmitry Yaniuk to use Company A's name on bid forms and other Company A's forms, Abramov and Dzmitry Yaniuk paid Individual A $150 for each car purchased at the ARU auctions. The use of Company A's name and its forms were essential to the scheme because MTA conflict of interest rules prohibited MTA employees from participating as bidders in the ARU auctions. As a further and essential part of the scheme, Marina Yaniuk provided Dzmitry Yaniuk and Abramov with the confidential bid prices submitted by other competing bidders. The conspirators were able to use this "last look" information to win bids at prices just slightly above the prices submitted by the second-place bidders.

## II.  SENTENCING GUIDELINES

### A.  The Parties' Plea Agreement and the Probation Department's PSR

The Sentencing Guidelines range is based on the "gain" from the scheme rather than the "loss" because determining the specific loss amount is difficult. A court can use gain when loss cannot be determined. U.S.S.G. § 2B1.1, Application Note 3 (explaining that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.").

In the parties' plea agreement, the government and Abramov stipulate to the following Sentencing Guidelines terms. The parties agree that Abramov's base offense level under U.S.S.G. § 2B1.1(a)(1) is 7. The parties disagree as to the gain from the scheme. The government's position is that the offense level is increased 6-levels under U.S.S.G. § 2B1.1(b)(1)(D) because the gain from the scheme is $64,500. The defendant's position is that offense level is increased 4-levels under U.S.S.G. § 2B1.1(b)(1)(C) because the gain from the scheme is between $18,500 and $40,000. With a two-level reduction for acceptance of responsibility, Abramov's resulting offense level is either 11 (the government's position) or 9 (the defendant's position). Accordingly, the defendant's Guidelines range is either 8 to 14 months' imprisonment under level 11 (the government's position) or 4 to 10 months' imprisonment under level 9 (the defendant's position).

In the plea agreement, the defendant also waived appeal so long as his sentence does not exceed 10 months' imprisonment, 3 years' supervised release, a $100 special assessment, and a $20,000 fine. The Probation Department has calculated the same offense level as the government, 11, and the government has no objection to the Probation Department's calculations. PSR ¶¶ 25-34.

    **B.**    **Abramov's Offense Level Should be Increased 6 Levels Because the Gain from the Scheme Was $64,500.**

The government's position is that the scheme resulted in profits to the conspirators of approximately $64,500. The government's investigation has revealed that the conspirators won vehicles at five auctions and purchased 48 vehicles totaling approximately $188,000 through the scheme. *See Exhibit 1*. At one of these auctions, 6 vehicles were auctioned together as a "lot," which the conspirators submitted the winning bid, while the other 42 vehicles were won separately by the conspirators. The scheme's profit is calculated by adding together the number

4

of cars won in the auctions separately, 42, and the one winning lot, for a total of 43, and multiplying that by the approximate gross profit earned from selling each car, $1,500.

The government's estimate of gross profit is based on estimates made by Abramov and Dzmitry Yaniuk.  In separate voluntary interviews, Abramov told the government that each vehicle sold for a profit of approximately $1,500-$2,000, while Dzmitry Yaniuk indicated that Dzmitry Yaniuk and Abramov made about $1,500 per vehicle.  *Exhibit 2 at 3 & 7.*  Exhibit 1 contains a summary of the MTA records showing the 42 vehicles and one lot that were purchased by the conspirators via Company A.  The government's estimate, if anything, is conservative in that it treats the 6 vehicles purchased together as a lot as deriving $1,500 in gross profit.

### III. THE §3553(A) FACTORS SUPPORT A SENTENCE WITHIN THE ADVISORY GUIDELINES RANGE

The government's recommendation of a sentence within the 8 to 14 months Guidelines range and a fine in the range of $4,000 to $40,000 is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553.  The most compelling factors weighing in favor of a sentence of imprisonment are the need for the sentence to reflect the seriousness of the offense, the characteristics of the defendant, and to achieve general deterrence.

#### A. Seriousness of the Offense

A significant sentence of imprisonment answers the need for the punishment to fit the "seriousness of defendant's offense." 18 U.S.C. § 3553(a)(2)(A).  Conspiracies that corrupt government processes are serious offenses, in that they impact scarce public resources, but also because they undermine trust in government institutions.  Marina Yaniuk was in a position of authority with control over a vital, public-facing MTA function.  Dzmitry Yaniuk and Abramov abused that position of authority.  As an immediate consequence, the MTA was harmed

financially because the conspirators would have bid higher amounts had they not had access to the confidential pricing information improperly provided by Marina Yaniuk. In addition, honest bidders lost auctions. As a long-term consequence, schemes like this one erode trust in public institutions, and undermine a public institution's ability to fund itself and deliver goods and services.

Such crimes also discourage honest bidders from competing. During the conspiracy, one of the other bidders complained to the MTA about the bid process. That bidder noticed patterns in Company A's winning bids and suspected that the process was rigged in Company A's favor. Formulating a bid takes time, and if the perception spreads that these auctions are rigged, honest bidders will simply sit out the process. To deliver on its mission, the MTA relies on the business community, and if honest companies steer clear of the MTA, the MTA's capabilities are compromised.

### B. History and Characteristics of the Defendant

A Guidelines sentence is also supported by the "the history and characteristics of the defendant." 18 U.S.C. §3553(a)(1). Abramov's scheme was motivated by greed and was not borne out of perceived necessity. Abramov had steady employment with the MTA and a solid middle-class salary. PSR ¶ 76. As such, Abramov stands apart from many other defendants who engage in criminal conduct out of a perceived need brought on by particularly difficult socioeconomic circumstances.

Furthermore, as an MTA employee, Abramov should have known better. Abramov understood that MTA's conflicts of interest rules prohibited his involvement in bidding. He flouted them by using a straw bidder, Company A. Moreover, this was not a momentary lapse in judgment—Abramov deceived his employer on multiple auctions over a sixteen-month period.

### C. The Need to Afford Adequate General Deterrence

Lastly, a significant sentence of imprisonment is critical "to afford adequate deterrence to criminal conduct" by other potential offenders. 18 U.S.C. § 3553(a)(2)(B). Fraud-based conspiracies, like the one perpetrated by Abramov, are very difficult to detect and prosecute. These crimes consist of secret agreements between individuals who are motivated to conceal their criminal activities. The conduct at issue victimized a cash-strapped public institution that provides vital infrastructure to millions of people every day. When offenders like Abramov are caught, the punishment must be substantial enough to far outweigh the expected criminal rewards, especially when the risk of detection is low.

## IV. RESTITUTION

In fashioning a sentence, the Court must consider the need to provide restitution to the victims. 18 U.S.C. §3553(a)(7). The sole victim in this case is the MTA. Normally, restitution would be required for this offense under 18 U.S.C. § 3663A(c)(1)(ii). The MTA suffered a loss because the last look provided to Company A allowed it to bid just above the next highest price, which likely was lower than if Company A had submitted its bid blindly. Additionally, the integrity of the bidding process was undermined, with at least one bidder being discouraged from competing at the auctions.

The government, however, finds that calculating the resulting loss to the MTA is difficult, if not impossible. The government is unable to calculate the higher auction prices that the MTA would have received if not for the conspiracy, or calculate the intangible loss to the MTA from a perception that its auctions were corrupted. Therefore, the government is not seeking restitution, pursuant to 18 U.S.C. §§ 3663A(c)(3)(B), because the complexity of

calculating restitution imposes a burden to the sentencing process outweighing the benefit. The MTA has been informed of the government's position on restitution and does not object.

## V.     CONCLUSION

In light of the seriousness of Abramov's crimes, his characteristics, and the need to promote general deterrence, the government respectfully recommends that the Court sentence Abramov within the 8 to 14 months Guidelines range and a fine of between $4,000 and $40,000.

Respectfully submitted,

_____/s/_____
Steven Tugander
Acting Assistant Chief
New York Office, Antitrust Division
U.S. Department of Justice

_____/s/_____
Milosz Gudzowski
Trial Attorney
New York Office, Antitrust Division
U.S. Department of Justice